[608 NYS2d 413]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
GREGORY SCHOOLFIELD, Appellant.

First Department, March 1, 1994

### APPEARANCES OF COUNSEL

*Richard L. Herzfeld* for appellant.

*Gregory Schoolfield,* appellant *pro se.*

*Lisa Ellen Mudd* of counsel *(Susan L. Valle* with her on the brief; *Robert T. Johnson, District Attorney* of Bronx County, attorney), for respondent.

### OPINION OF THE COURT

SULLIVAN, J.

██ ██ Convicted, after a jury trial, of arson in the second degree, defendant seeks reversal on the grounds, *inter alia,* that the trial court improperly denied him his right to proceed *pro se* and erroneously refused his request for an adverse inference charge based on the loss of the fire marshal's handwritten notes which were the basis of his final report. Since these two contentions have merit, reversal is in order.

The trial evidence showed that, shortly after 2:00 A.M. on May 23, 1987, defendant set a fire in front of the closed door of his estranged wife's apartment. Earlier that evening, defendant, who had a history of assaultive behavior towards his wife, attempted to enter the apartment but was kept out by his stepdaughter and a friend, both of whom defendant threatened. At about 2:00 A.M., a neighbor who lived on the same floor as defendant's wife, and who had known defendant for some five years, saw defendant, whom he had not seen for months, walking in the hallway outside of his wife's apart-

ment carrying a book of matches. The neighbor noticed that defendant smelled of gasoline. He also observed, on the hallway floor, a coffee can which had a see-through lid and contained a clear liquid which smelled like gasoline. The neighbor decided to take the stairway and call defendant's wife as soon as he could reach a telephone.

Apparently, after the neighbor had left the hallway and just as defendant's wife completed a telephone call, she saw flames at the apartment door. She ran to the window to call for help as her daughter extinguished the fire with potfuls of water. Within minutes of seeing defendant lurking in the hallway outside of his wife's apartment, the neighbor heard defendant's wife screaming from her window and saw defendant exiting the building. From her window, defendant's wife and her daughter also saw defendant leaving the building. The fire marshal confirmed that gasoline had been poured on the floor outside the door to defendant's wife's apartment and ignited. On such evidence, a jury would have little difficulty in finding that defendant's guilt had been established beyond a reasonable doubt.

As a backdrop to defendant's claim of improper denial of his right to proceed *pro se,* it should be noted that in the almost four-year interval between defendant's arrest and conviction he was examined numerous times pursuant to CPL article 730 and was found alternately competent and incompetent to stand trial and, in turn, committed to, and returned from, the custody of the Commissioner of Mental Hygiene. Perhaps the best description of defendant's mental condition appears in a January 10, 1989 letter, taken from the court file, from an examining physician to one of defendant's various successive attorneys in which it is stated: "I examined your client * * * today and found him to be suffering from an active psychotic disorder of a paranoid type, namely, PARANOID SCHIZOPHRENIA. He suffers from auditory hallucinations, delusions of a bizarre and persecutory nature, and is intent on using the legal process as a vehicle for acting out many of his paranoid psychotic preoccupations. * * * In my opinion, he lacks the capacity to waive his right to counsel or to represent himself. If he acts *pro se,* he will turn the proceedings into a mockery, because he is not acting in a rational manner to achieve reasonable ends, but primarily is intent on getting back at his imaginary enemies and exposing them in the eyes of the world. His 'grievances' are clearly the product of his illness. * * * In order to protect his rights and to preserve the

integrity of the proceedings, it is absolutely necessary that he be represented by legal counsel."

Defendant's first trial had ended in a mistrial on June 16, 1988. At that trial, he had been granted permission to proceed *pro se.* When his "standby counsel" announced during jury selection that defendant's voir dire examination was inept, defendant had second thoughts, stated that he no longer wished to proceed *pro se,* and consented to a mistrial and was assigned another attorney.

The retrial took place in 1991, after defendant had again been found unfit to stand trial, committed to the custody of the Commissioner of Mental Hygiene and eventually returned as fit. Once again, defendant requested to proceed *pro se.* The court conducted a hearing to determine whether defendant could competently waive his right to counsel. The hearing was conducted in two stages: the court's examination of defendant while two psychiatrists, who had previously examined him, observed him in the courtroom; the second stage consisted of the testimony of the two psychiatrists.

At the outset, the court noted, "I have been told that a fellow Justice of this Court granted a mistrial * * * because you interfered somewhat, according to the Judge, with the orderly process of the trial and that your communications with the jury were really non-communications". The court then observed, "The standard of competency for waiving counsel and appearing pro se is a much higher standard than competence to stand trial and that's what I'm trying to determine."

Initially, the court interrogated defendant at great length and ascertained that he comprehended the seriousness of the charges and the disadvantages of proceeding *pro se.* Defendant had extensive familiarity with the criminal justice system; he had filed 17 motions in Supreme Court, Bronx County, and 11 in the Federal District Court and instituted two Court of Claims actions, one for damages for false arrest and the other for an assault allegedly committed on him at a State Department of Mental Hygiene facility. Defendant testified that although he once heard voices in the past he no longer did.

The first psychiatrist testified that he had recently examined defendant and was present during his testimony at the hearing. The psychiatrist was also familiar with defendant from earlier stages of the prosecution, having evaluated him pursuant to CPL article 730 and at one time finding him unfit

to stand trial. The psychiatrist noted an improvement; while finding defendant now fit to stand trial, he nevertheless was of the view that defendant was not competent to proceed *pro se.** In reaching such conclusion, the psychiatrist took into account the trial court's statement that competence to proceed *pro se* is determined by a higher standard than competence to stand trial. He was also influenced by defendant's penchant for trivia and inability to make a point. The other psychiatrist expressed similar views.

The trial court ruled, based on the psychiatric testimony, that defendant "is competent to proceed [to] trial and he is not competent to represent himself[;] he cannot, in my opinion, make a knowing and voluntary waiver as required by the very high standard the courts have given me to waive his right to counsel". Defendant proceeded to trial a few months later with his seventh court-appointed attorney. Although the transcript reveals several warnings to defendant against disrupting the proceedings during the course of the trial, no actual disruptions are recorded.

The right of an accused to proceed *pro se* is a fundamental right implicitly guaranteed by the Sixth Amendment of the United States Constitution *(see, Faretta v California,* 422 US 806, 818-820) and explicitly guaranteed by New York State Constitution, article I, § 6 *(see, People v Rosen,* 81 NY2d 237, 243). When confronted with an election to proceed *pro se,* the court's only function is to ensure that the defendant is acting knowingly and voluntarily, that is, that the defendant is aware of the disadvantages and risks of waiving his right to counsel. *(People v Vivenzio,* 62 NY2d 775; *see also, Faretta v California,* 422 US, *supra,* at 835.) If the waiver of the right to counsel is knowing and voluntary, the application must be granted. *(People v McIntyre,* 36 NY2d 10.)

A defendant need not be versed in criminal procedure to exercise his right to proceed *pro se. (See, People v McIntyre, supra,* at 17-18.) Were it otherwise, the right of self-representation would be rendered virtually meaningless. *(See, supra; see also, People v Davis,* 49 NY2d 114, 120.) That a defendant's decision may be improvident or that he might be better served with counsel is immaterial. "A criminal defendant is entitled to be master of his own fate[,] and 'respect for individual autonomy requires that he be allowed to go to jail under his own banner if he so desires and if he makes the choice "with

---

* Defendant's *pro se* briefs in this Court are virtually unintelligible.

eyes open" '." *(People v Vivenzio,* 62 NY2d, *supra,* at 776, quoting *United States ex rel. Maldonado v Denno,* 348 F2d 12, 15.)

█ In denying defendant's application to proceed *pro se,* the well-intentioned trial court, although acting in defendant's best interest, applied an improper standard and, in so doing, "arrogated to itself and denied to defendant the exercise of rights constitutionally guaranteed to him." *(People v Davis,* 49 NY2d, *supra,* at 120.)

The Court of Appeals has clearly enunciated the focus of judicial inquiry in determining such an application. "A defendant in a criminal case may invoke the right to defend *pro se* provided: (1) the request is unequivocal and timely asserted, (2) there has been a knowing and intelligent waiver of the right to counsel, and (3) the defendant has not engaged in conduct which would prevent the fair and orderly exposition of the issues." *(People v McIntyre,* 36 NY2d, *supra,* at 17.) As this record discloses, the trial court denied the application under the second prong of the *McIntyre* test, finding that defendant had the competency to stand trial but not to waive counsel. There is no such distinction. While the determination that the waiver of the right to counsel was intelligent and voluntary may turn on the defendant's mental capability at the time of waiver *(People v Reason,* 37 NY2d 351, 354), the second prong of *McIntyre* is satisfied when a defendant, competent to stand trial, satisfies the court, upon inquiry, that he understands the risks and disadvantages of proceeding *pro se.* *(People v Reason, supra,* at 355.)

On appeal, the People advance a ground not previously raised and not explicitly relied upon by the trial court in denying the *pro se* application. They argue, citing the third prong of the *McIntyre* test (36 NY2d, *supra,* at 17), that defendant's mental condition, as evidenced by his numerous groundless motions and lawsuits, his rambling, pointless arguments and inability to proceed *pro se* at his 1988 trial, would lead him to "engage in conduct which would prevent the fair and orderly exposition of the issues." Since this issue was never raised before the trial court and defendant was thereby deprived of the opportunity to address it, the People may not raise it now. *(See, People v Erts,* 73 NY2d 872, 874.)

In any event, the argument lacks merit. In *McIntyre,* the Court of Appeals was quite specific about the type of conduct which would bar a defendant from self-representation. It must

be of the type to effect a forfeiture of the *pro se* right. "When a defendant's conduct is calculated to undermine, upset or unreasonably delay the progress of the trial he forfeits his right to self-representation." (36 NY2d, *supra*, at 18.) Defendant's various motions and collateral proceedings, as burdensome and meritless as they may be, cannot be viewed as calculated to undermine or delay the progress of the trial. Nor would his unfocused arguments be sufficient to effect forfeiture of his *pro se* right.

Aside from a few warnings, by themselves no evidence of disruptive conduct, all of which were given subsequent to the denial of the *pro se* application, there is nothing in this record to justify the denial of defendant's application on that basis. Even the few isolated warnings fail to reveal an effort to undermine the proceedings. Finally, defendant's ineptitude in self-representation at his 1988 trial affords no basis for denial of his *pro se* application. Ineptitude, inherent in almost any case of self-representation, is a constitutionally protected prerogative. In any event, although found incompetent after that trial, defendant has subsequently been found fit and, according to the expert testimony, his mental condition has greatly improved.

We recognize, of course, that any trial involving a litigious "Hypercompetent Defendant", as defendant has been described, puts an enormous strain on a Trial Judge even when such a defendant is represented. That burden is drastically compounded when he proceeds *pro se.* This circumstance is, however, not a relevant factor in the determination whether to allow a defendant to represent himself. If a defendant is competent to stand trial he is competent to represent himself as long as, as is the case here, he meets the standard set forth in *McIntyre* and *Reason.*

■ The trial court's *Rosario* ruling provides an additional ground for reversal. The investigating fire marshal, a trial witness, made handwritten notes of his interviews with the three main prosecution witnesses, defendant's wife, his stepdaughter and the neighbor. The notes, which were incorporated into his typed report, were lost sometime after the report was completed. At a hearing during the trial as to the lost notes, the fire marshal testified that his typed reports were never verbatim copies of the handwritten notes, although they contained all the facts in the handwritten notes. As he testified, "[t]he finished product is always bigger than the original notes" since his notes contain only an outline of a

witness's statement. As the People concede, these notes constituted *Rosario* material.

Defense counsel requested "the equivalent of a missing witness charge on the failure and the destruction of the original notes pursuant to *[Ranghelle], Rosario* and the like." The request, which was sufficient to preserve the issue, was denied, the court ruling that the handwritten notes were a duplicate equivalent of the typed report. This was error. By the fire marshal's own testimony, the typed report was not a duplicate equivalent of the handwritten notes. "Indeed, a statement that is consistent with other disclosed material but omits details or facts cannot be considered the 'duplicative equivalent' of the disclosed material, since omissions often furnish important subjects for cross-examination." *(People v Young,* 79 NY2d 365, 370.)

The People have an obligation to preserve evidence. *(People v Martinez,* 71 NY2d 937, 940.)* When *Rosario* material is lost or destroyed prior to trial and the defendant is prejudiced, a court is required, on request, to impose an appropriate sanction. *(Supra.)* There was prejudice here. A critical trial issue was whether defendant's wife and stepdaughter identified him as the perpetrator. While the stepdaughter claimed that she had, she was sharply cross-examined as to whether, when interviewed, she had indicated some uncertainty. Her testimony was that she told the fire marshal that she was "pretty sure" she saw defendant walking away from the building. Since the stepdaughter could not recall her exact words at trial, the written notes could have been used in cross-examining her. The absence of these notes prejudiced counsel's ability to confront the witness. At the very least, defendant was entitled to an adverse inference charge. *(See, People v Boyne,* 174 AD2d 103, 109.)

We have examined defendant's other contentions and find them to be without merit.

Accordingly, the judgment of the Supreme Court, Bronx County (Irene Duffy, J.), rendered June 18, 1991, convicting defendant of arson in the second degree and sentencing him, as a predicate felony offender, to an indeterminate term of imprisonment of from 10 to 20 years, should be reversed, on the law, and the matter remanded for a new trial.

MURPHY, P. J., ROSENBERGER and WALLACH, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered June 18, 1991, reversed, on the law, and the matter remanded for a new trial.